**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| KATHRYN CALIGUIRI IRREVOCABLE TRUST, Derivatively on Behalf of CAPITAL ONE FINANCIAL CORPORATION, | Case No.: _____ |
| Plaintiff, | |
| v. | |
| RICHARD D. FAIRBANK, ANDREW M. YOUNG, IME ARCHIBONG, CHRISTINE DETRICK, ANN FRITZ HACKETT, PETER THOMAS KILLALEA, CORNELIS PETRUS ADRIANUS JOSEPH LEENAARS, FRANÇOIS LOCOH-DONOU, PETER E. RASKIND, EILEEN SERRA, MAYO A. SHATTUCK III, and CRAIG ANTHONY WILLIAMS, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| -and- | |
| CAPITAL ONE FINANCIAL CORPORATION, | |
| Nominal Defendant. | <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Kathryn Caliguiri Irrevocable Trust ("**Plaintiff**"), by and through its undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Capital One Financial Corporation ("**Capital One**" or the "**Company**"), against certain of the Company's executive officers and its Board of Directors (the "**Board**") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to its own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by Plaintiff's counsel, including review

of publicly available information regarding the Company; filings in the class action captioned *In re: Capital One 360 Savings Account Interest Rate Litigation*, Case No. 1:24-md-03111-DJN-LRV (E.D. Va.) (the "**Consumer Class Action**"); the allegations of a complaint filed by the Consumer Financial Protection Bureau ("**CFPB**") captioned *Consumer Financial Protection Bureau v. Capital One Financial Corporation, et al.*, Case No. 1:25-cv-00061 (E.D. Va.) (the "**CFPB Action**"); the allegations of a complaint filed by the Attorney General of the State of New York captioned *The People of the State of New York v. Capital One, N.A., et al.*, Case No. 1:25-cv-04037 (S.D.N.Y.) (the "**NYAG Action**"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "**SEC**"); press releases disseminated by Capital One; legal filings; news reports; and securities analysts' reports about the Company. The allegations herein are also based on a review of books and records produced by the Company in response to Plaintiff's demand made pursuant to 8 *Del. C.* § 220 (the "**Section 220 Production**"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a stockholder derivative action brough by Plaintiff on behalf of nominal defendant Capital One against members of its Board and members of the Company's upper management. The wrongdoing alleged herein has caused substantial damage to Capital One's reputation, goodwill, and standing in the business community, and has exposed Capital One to substantial potential liability for violations of the law and the costs associated with defending itself against numerous lawsuits. The violations of the law outlined herein have damaged Capital One in the form of, among other things, hundreds of millions of dollars expended to settle the Consumer

Class Action. This action seeks to remedy the wrongdoing committed by Capital One's directors and officers from at least 2019 through the present (the "**Relevant Period**").

2.    Founded in 1987, Capital One and its subsidiaries offer various financial products and services to consumers, small businesses, and commercial clients through both physical locations and digital channels.

3.    In 2012, as part of the Company's growth strategy, it acquired ING Direct USA ("**ING**"), adding about $80 billion in deposits and making Capital One the fifth-largest lender by U.S. deposits. According to the Company's Chairman and Chief Executive Officer ("**CEO**"), Richard D. Fairbank ("**Fairbank**"), the ING acquisition was "a very low-cost way for Capital One to become a national player in banking."[1]

4.    In connection with its acquisition of ING, the Company  acquired ING's high-yield savings product, "ING Direct" which it rebranded as "360 Savings."   In an effort to provide reassurance to consumers during the transition, Capital One made the following pledge to its customers:



---

[1] Dakin Campbell, *Capital One's $9 Billion ING Direct Deal Is Approved by Fed*, Bloomberg (Feb. 15, 2012), available at https://www.bloomberg.com/news/articles/2012-02-14/capital-one-s-9-billion-acquisition-of-ing-direct-usa-wins-fed-s-approval.

5. During the Relevant Period, however, Capital One misled 360 Savings account holders by promoting a nearly identical product, "360 Performance Savings", which offered a significantly higher interest rate than that what was being paid to legacy 360 Savings account customers.

6. The deception was calculated. The Company removed references to "360 Savings" on its website and replaced them with references to "360 Performance Savings" without disclosing to legacy 360 Savings accountholders that 360 Performance Savings was a distinct product from 360 Savings and paid a materially higher rate of interest on deposits..

7. Capital One also prohibited its employees from actively informing 360 Savings accountholders about 360 Performance Savings, the differences between them, and the ability for a 360 Savings accountholder to open a 360 Performance Savings account.

8. Although the Company saved an estimated $2 billion by keeping 360 Savings customers from earning the dramatically higher rates offered on 360 Performance Savings accounts, the Individual Defendants also exposed the Company to substantial risk of litigation and regulatory scrutiny.

9. The Company has expended resources in connection with both the CFPB Action and the NYAG Action, and recently settled the Consumer Class Action for $425 million.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

12.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Capital One is headquartered in McLean, Virginia, within this District, and a substantial portion of the acts and omissions alleged herein occurred in this District. Accordingly, much of the relevant evidence and many of the relevant witnesses will be located in this District.

14.     Moreover, pursuant to Rule 1.1(h) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation (the "JPML Rules"), this action is a "tag-along action" because it involves common questions of fact with the Consumer Class Action, an MDL pending in this District. Therefore, venue is also proper in this District pursuant to Rule 7.2(a) of the JPML Rules, as well as the Transfer Order filed in the Consumer Class Action. *See* Consumer Class Action, Dkt. 1.

## PARTIES

### *Plaintiff*

15.     Plaintiff is, and has been at all relevant times, a shareholder of Capital One.

### *Nominal Defendant*

16.     Nominal Defendant Capital One is a holding company incorporated in Delaware with principal executive offices located at 1680 Capital One Drive, McLean, Virginia, 22102. The Company's common stock trades on the New York Stock Exchange ("**NYSE**") under the ticker

5

symbol "COF." The Company does business through its principal operating subsidiary, Capital One, N.A. ("**CONA**"), a national bank with its principal place of business in McLean, Virginia. Unless otherwise stated herein, when referring to "Capital One," Plaintiff refers collectively to Capital One and its subsidiaries, including CONA.

***Individual Defendants***

17.     Defendant Fairbank founded Capital One in 1987, and has served as the Company's CEO since its initial public offering in November 1994, and as Chairman since February 1995. Fairbank also serves as Chair of the board of directors of CONA. According to the proxy statement filed on Schedule 14A with the SEC on March 27, 2025 (the "**2025 Proxy**"), Defendant Fairbank received $33,500,616 in total compensation from the Company in 2024.

18.     Defendant Andrew M. Young ("**Young**") joined the Company in June 1996, and has served as Chief Financial Officer ("**CFO**") of Capital One since March 2021. From April 2018 to February 2021, he served as Senior Vice President and Business Line Chief Financial Officer. He also served as CFO of CONA from July 2018 to February 2021. According to the 2025 Proxy, Young received total compensation of $5,844,892 from the Company in 2024.

19.     Defendant Ime Archibong ("**Archibong**") has served as a member of the Board since 2021. He also serves as a member of the Board's Compensation Committee. According to the 2025 Proxy, Archibong received total compensation of $363,221 from the Company in 2024.

20.     Defendant Christine Detrick ("**Detrick**") has served as a member of the Board since 2021. She also serves as a member of both the Risk Committee and the Audit Committee. According to the 2025 Proxy, Detrick received total compensation of $413,221 from the Company in 2024.

21.     Defendant Ann Fritz Hackett ("**Hackett**") has served as a member of the Board since 2004 and currently serves as Lead Independent Director. She also serves on the Board's Compensation Committee, chairs the Governance and Nominating Committee, and is a member of the Risk Committee. According to the 2025 Proxy, Hackett received total compensation of $543,221 from the Company in 2024.

22.     Defendant Peter Thomas Killalea ("**Killalea**") has served as a member of the Board since 2016. He is a member of both the Compensation Committee and the Risk Committee. According to the 2025 Proxy, he received total compensation of $393,221 from the Company in 2024.

23.     Defendant Cornelius Petrus Adrianus Joseph Leenaars ("**Leenaars**") has served as a member of the Board since 2019. He also serves as Chair of the Risk Committee, and as a member of both the Audit Committee and the Compensation Committee. According to the 2025 Proxy, he received total compensation of $470,149 from the Company in 2024. In addition to his standard compensation as a member of the Board, the 2025 Proxy indicates that Leenaars received an additional $25,000 "in recognition of the extra time and effort that is required for Mr. Leenaars to travel internationally to attend Board and committee meetings."

24.     Defendant François Locoh-Donou ("**Locoh-Donou**") has served as a member of the Board since 2019. He serves as Chair of the Compensation Committee and is also a member of the Governance and Nominating Committee. According to the 2025 Proxy, he received total compensation of $414,469 from the Company in 2025.

25.     Defendant Peter E. Raskind ("**Raskind**") has served as a member of the Board since 2012. He also serves as a member of both the Risk Committee and the Governance and Nominating

7

Committee. According to the 2025 Proxy, he received total compensation of $418,221 from the Company in 2024.

26.    Defendant Eileen Serra ("**Serra**") has served as a member of the Board since 2020. She is also Chair of the Audit Committee and a member of the Risk Committee. According to the 2025 Proxy, she received total compensation of $453,221 from the Company in 2024.

27.    Defendant Mayo A. Shattuck III ("**Shattuck**") has served as a member of the Board since 2003. He serves on both the Compensation Committee and the Governance and Nominating Committee. According to the 2025 Proxy, he received total compensation of $394,621 from the Company in 2024.

28.    Defendant Craig Anthony Williams ("**Williams**") has served as a member of the Board since 2021. He currently serves on both the Compensation Committee and the Governance and Nominating Committee, and he previously served as a member of the Audit Committee. According to the 2025 Proxy, he received total compensation of $393,221 from the Company in 2024.

29.    Collectively, defendants Fairbank, Young, Archibong, Detrick, Hackett, Killalea, Leenaars, Locoh-Donou, Raskind, Serra, Shattuck, and Williams are referred to herein as the "**Individual Defendants**."

***Relevant Non-Parties***

30.    Suni P. Harford ("**Harford**") has served as a member of the Board since April 1, 2024. She is a member of the Audit Committee and the Risk Committee.

31.    Thomas G. Maheras ("**Maheras**") has served as a member of the Board since May 18, 2025. He was appointed to the Board in accordance with the merger agreement governing the

Company's acquisition of Discover Financial Services. Maheras is a member of the Risk Committee.

32.     Michael Shepherd ("**Shepherd**") has served as a member of the Board since May 18, 2025. He was appointed to the Board in accordance with the merger agreement governing the Company's acquisition of Discover Financial Services. He is a member of both the Audit Committee and the Risk Committee.

33.     Jennifer L. Wong ("**Wong**") has served as a member of the Board since May 18, 2025. She was appointed to the Board in accordance with the merger agreement governing the Company's acquisition of Discover Financial Services. She is a member of the Risk Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

35.     Each director and/or officer of the Company owes to Capital One and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

36. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

37. To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at Capital One had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

39. To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things, ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and, pursuant to Capital One's own Code of Conduct.

10

40.     Each of the Individual Defendants further owed to the Company and its shareholders a duty of loyalty requiring that he or she favor the Company's interest and that of its shareholders over his or her own interest while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

41.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

42.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or

11

negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are officers and/or directors of Capital One, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

48.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Capital One and at all times acted within the course and scope of such agency.

## CAPITAL ONE'S CODE OF CONDUCT

49.    The Individual Defendants, as officers and/or directors of Capital One were bound by the Company's Code of Conduct. The Code of Conduct begins with a message from Defendant Fairbank, which states, in pertinent part:

> Since our founding, we've been focused on fostering an open culture, guided by our core values of Excellence and Do the Right Thing. We are committed to fairness and honesty in the decisions we make every day. We hold ourselves—as an organization and as individuals—to the highest standards of ethical business practices and behavior.

Each of us plays an important role in building and maintaining our world class culture, brand, and reputation. We have a Code of Conduct, which outlines our responsibilities as associates. By adhering to our Code, you are living our values and ensuring that Capital One is modeling the highest standards of personal behavior and business conduct in everything we do.

\* \* \*

Our quest to build an enduringly great company requires an unwavering commitment to doing the right thing and demonstrating the highest standards of integrity and professionalism. Thank you for living our values every day as we work to Change Banking for Good.

50.     The Code of Conduct claims that "Capital One's culture is built on two core values: Excellence and Do the Right Thing."[2] According to the Code of Conduct, "Do the Right Thing" describes how Capital One associates[3] "interact with each other, our business partners, and our customers. We Do the Right Thing through five principles: Open; Teamwork; Respect for Each Other; Respect for Our Customers; and Integrity."

51.     The Code of Conduct purportedly "memorializes Capital One's commitment to comply with applicable laws, regulations, and Capital One policies governing our conduct and operations and to earn our reputation for honesty, fair dealing, and integrity every day."

52.     In a section entitled "Our Responsibilities," the Code of Conduct states, in relevant part:

> We expect all associates to live our Company's values by doing the right thing. Knowing, understanding, and following applicable laws, regulations, and Company policies are critical to living our values, safeguarding Capital One's reputation, and maintaining our customers' trust. References in this document to "the Code" and "Company policy" are intended to include all relevant policies, standards, and procedures, and our Code should be read and understood in conjunction with those. Where applicable laws or regulations differ from our Code, policies, standards, or procedures,

---

[2] Red text in original.

[3] The Code of Conduct "applies to all Capital One associates and members of the Company's Board of Directors and extends to all Capital One subsidiaries. References to 'Capital One associates' in our Code cover Board members and associates, including those in our international locations."

or where an international location, line of business, department, group, or team has specific requirements, we are expected to follow the most restrictive applicable requirement. We must comply with the letter and spirit of the law and our Code, use fact-based and sound judgment, and seek guidance whenever needed. Associates who violate our Code may be subject to legal action and discipline up to and including termination of employment.

53.     In a section entitled "Our Culture," the Code of Conduct states, in relevant part:

As the stewards of our corporate culture, we must:

- Remember that assuming positive intent is not a substitute for controls and monitoring;

- Challenge ourselves and our colleagues to continuously assess whether we have sufficient governance and sustainable protocols to ensure our ideas, products, and services are well conceived and well grounded;

- Continuously evaluate how our products and services impact our customers and the communities we serve; and

- Avoid insularity bias by seeking diverse perspectives both inside and outside of Capital One.

Employing these concepts will improve our effectiveness and reinforce our culture by self-identifying and remediating issues and proactively managing risk.

54.     In a section entitled "Our Obligation to Report," the Code of Conduct states, in

relevant part: "Doing the right thing includes speaking up. **We expect all Capital One associates**

**to immediately report any suspected or potential violations of law, our Code, Company**

**policy, or other actions inconsistent with our values.**"[4]

55.     In a section entitled "Accurate Recordkeeping and Reporting," the Code of Conduct

states, in relevant part:

As Capital One associates, one of our most important duties is to ensure that our Company's business transactions, finances, and operations are reported accurately, completely, and in a timely and understandable manner. We also must ensure that the data we provide for the preparation of financial statements, regulatory

---

[4] Emphasis in original.

reports, and publicly filed documents comply with all applicable generally accepted accounting principles, regulatory reporting requirements, and our Company's information and reporting policies.

56.     In a section entitled "Protecting Information and Assets," the Code of Conduct reminds associates that "[a] vital part of protecting our Company's information and assets is to combat internal fraud[,] which the Code of Conduct describes as "any effort by an insider to deprive Capital One or [its] customers of any assets by theft, deception, or other corrupt means."

57.     Finally, in a section entitled "Ethical Business Practices," the Code of Conduct states, in relevant part:

> One of our core values is Do the Right Thing. This means that we respect our customers and pursue all business opportunities with integrity. We do this by clearly and truthfully communicating with our customers about our products and services. It also means we hold ourselves and our partners to the highest ethical standards in our business dealings.
>
> * * *
>
> We must communicate with our customers clearly and truthfully. All sales, marketing, advertising, collections, and recoveries activities must include all material information and disclosures necessary to make them accurate and complete…. Failure to adhere to these standards may cause financial injury to our customers, undermine our reputation, and subject the company to regulatory scrutiny and potential adverse actions.
>
> * * *

To ensure we are living our values, we must remember:

- Our marketing and other customer communications and disclosures must be accurate and clear;

- Our products and services must be explained in a way that helps customers make fully informed decisions, including providing them with complete and accurate disclosure of all material terms and conditions before enrolling them in any products or services;

- We receive customer consent before opening a customer account, or setting up modified payment arrangements;

- New and existing products must be regularly reviewed for compliance with laws and regulations;

- Customer complaints must be properly assessed and handled consistent with the Enterprise Complaints Operating Standard; and

- We should not steer customers to certain products due to performance or sales incentives.

## CAPITAL ONE'S AUDIT COMMITTEE CHARTER

58.     According to the Charter of the Audit Committee of the Board of Directors (the "**Audit Committee Charter**"), the purpose of the Audit Committee is to, among other things:

> [A]ssist the Board in the oversight of (i) the integrity of the financial statements and internal controls over financial reporting of the Corporation, (ii) the qualifications, independence, and performance of the Corporation's independent auditor, (iii) the performance of the Corporation's internal audit function, and (iv) the compliance by the Corporation with legal and regulatory requirements….

> \* \* \*

> The Committee's primary responsibility is one of oversight and it recognizes that the Corporation's management is responsible for preparing the Corporation's financial statements and that the independent auditor is responsible for auditing those financial statements. The Committee also recognizes that management and the independent auditor have more time, knowledge, and detailed information about the Corporation than the Committee members have….

59.     With respect to the Company's financial statements and internal controls over financial reporting, the Audit Committee Charter sets forth, *inter alia*, the following duties of the Audit Committee:

> 14. Meet to review and discuss the quarterly and annual financial statements and related footnotes of the Corporation and its subsidiaries with management and the independent auditor, as well as the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the independent auditor's reports related to the Corporation's financial statements.

* * *

19. Review disclosures made to the Committee by the Corporation's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, any fraud involving any employees who have a significant role in the Corporation's internal control over financial reporting, and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

* * *

22. Review with the General Counsel or the attorney(s) designated by the General Counsel any legal matters that may have a material impact on the financial statements.

* * *

24. Review with management, the Chief Audit Officer, the Chief Compliance and Ethics Officer, and the independent auditor any correspondence with regulators or governmental agencies and any employee "whistleblower" complaints or published reports which raise material issues regarding the Corporation's financial statements or accounting policies, procedures or controls in accordance with the Committee's established procedures and the process for obtaining and handling such complaints or published reports.

25. In accordance with applicable law and regulatory requirements, (i) review and recommend to the Board the Corporation's policy that addresses its approach for determining market risk disclosures and the associated internal controls and disclosure controls and procedures; (ii) oversee that appropriate verification of such disclosures takes place and that effective internal controls and disclosure controls and procedures are maintained; and (iii) review the market risk disclosures made pursuant to such policy.

60.    The Audit Committee Charter also provides that the Audit Committee has the

following duties relating to risk assessment and risk management:

> In consultation with the Risk Committee, and as required by New York Stock Exchange rules, review and discuss with the Chief Risk

Officer(s), and other members of management as the Committee deems appropriate, at least annually, (i) the key guidelines and policies governing the Corporation's significant processes for risk assessment and risk management; and (ii) the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

61.     In connection with reporting and compliance matters, the Audit Committee Charter

describes the Audit Committee's duties, in relevant part, as follows:

29. Receive, at least annually, written reports from and discuss with the Chief Compliance and Ethics Officer matters that may have a material impact on the Corporation's compliance with state and federal laws, rules, regulations, including significant legal and regulatory initiatives, or the standards or codes of conduct of self-regulatory organizations applicable to the Corporation's activities. The Committee shall meet and discuss these matters with management and others, as appropriate, including the General Counsel of the Corporation.

30. Notwithstanding the Risk Committee's oversight of the Corporation's enterprise-wide risk management program, review and discuss with the Chief Compliance and Ethics Officer, and other members of management as the Committee deems appropriate, at least annually, the implementation and effectiveness of the Corporation's enterprise-wide compliance program, including management's corrective actions for any deficiencies with respect thereto. The Chief Compliance and Ethics Officer shall have the authority to communicate directly to the Committee, promptly, about material, actual, and alleged violations of law.

* * *

32. Review with management the Corporation's ethics program that monitors compliance with the Corporation's Code of Conduct and the record of such compliance. Additionally, review and recommend to the Board (or disinterested members of the Board, as appropriate) approval of (i) the Corporation's Code of Conduct and any material changes thereto; and (ii) any waiver of the Code of Conduct for directors and certain executive officers.

* * *

34. Authorize, review and approve the report of the Committee required by the rules of the SEC to be included in the Corporation's annual proxy statement.

## CAPITAL ONE'S RISK COMMITTEE CHARTER

62.    The Charter of the Risk Committee of the Board of Directors (the "**Risk Committee Charter**"), describes the purpose of the Risk Committee, in relevant part, as follows:

> The Risk Committee [] is appointed by the [Board]…to assist the Board in discharging its oversight of the Corporation's enterprise-wide risk management framework, including policies and practices established by management to identify, assess, measure and manage key risks facing the Corporation across all of the Corporation's risk categories: strategic, compliance, operational, reputation, credit, market, and liquidity risk.
>
> \* \* \*
>
> The Committee's primary responsibility is one of oversight of enterprise-wide risk management, and it recognizes that the Corporation's management is responsible for managing its risk function and for reporting on its processes and assessments with respect to the Corporation's management of risk. Accordingly, in assisting the Board with its oversight responsibilities with respect to risk management, the Committee may rely on management to assume the primary responsibility for the risk management function at the enterprise level and to see that risk management policies, procedures and limits are developed throughout each line of business and staff group, as applicable, to achieve desired results.

63.    In furtherance of the Risk Committee's oversight of the Company's enterprise-wise risk management framework, the Risk Committee Charter describes the Risk Committee's duties as follows:

> 1.    Review and recommend to the Board for approval the Corporation's risk management framework (and any significant changes thereto) and the key risk management policies developed for the Corporation.
>
> 2.    Receive and review management reports from the Chief Risk Officer(s) and other members of management, as applicable, on the Corporation's risk management framework, risk management programs (including steps taken to identify, assess, measure, and manage[] the Corporation's key risks) and their results, including any risk management deficiencies and emerging risks, such as risks related to environmental, social, and governance matters in

coordination with the full Board or other Board committees, as appropriate.

\* \* \*

4. Review and assess the adequacy and effectiveness of the Corporation's enterprise-wide risk assessment processes; and review and address, as appropriate, management's corrective actions for any deficiencies that may arise with respect to the effectiveness of such programs.

5. Receive reports from the Head of Regulatory Relations or other members of management, as appropriate, on material inquiries received from, and any reports of examination submitted by, the various federal and state financial institution regulatory authorities and management's responses to such reports or inquiries.

6. Receive reports from, review with, and provide feedback to, management on the Corporation's strategic, compliance, operational, reputation, credit, market, and liquidity risk categories, the exposures in each category, significant concentrations within those risk categories, the metrics used to monitor the exposures and management's views on the acceptable and appropriate levels of those risk exposures.

64. The Risk Committee Charter also requires the Risk Committee to "[r]eceive and review regular reports from the Chief Risk Officer(s) at least quarterly."

## THE FALSE AND MISLEADING PROXY STATEMENT

65. Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) prohibit proxy statements from containing statements that are false or misleading with respect to material facts or omitting material facts necessary to make statements not misleading.[5]

---

[5] This complaint explicitly alleges a Section 14(a) violation based on negligence, not fraud or recklessness, asserting that the Individual Defendants should have known that disclosures made in the 2023 Proxy (as defined herein) were misleading due to the omission of material facts about the 360 Savings and 360 Performance Savings practices.

66.    The Company filed its 2023 Definitive Proxy Statement on March 22, 2023 (the "**2023 Proxy**") in connection with its annual stockholders meeting scheduled for May 4, 2023.[6] The 2023 Proxy solicited stockholder votes on the following nine proposals:

As a stockholder, you will be asked to:

1.    Elect twelve nominated directors, who are listed in the proxy statement, as directors of Capital One;

2.    Approve amendments to Capital One Financial Corporation's Restated Certificate of Incorporation to remove remaining supermajority voting requirements and references to Signet Banking Corporation;

3.    Approve, on a non-binding advisory basis, the frequency with which Capital One will hold an advisory vote to approve our Named Executive Officer compensation ("Say When on Pay");

4.    Approve, on a non-binding advisory basis, our Named Executive Officer compensation ("Say on Pay");

5.    Approve and adopt the Capital One Financial Corporation Seventh Amended and Restated 2004 Stock Incentive Plan;

6.    Ratify the selection of Ernst & Young LLP as our independent registered public accounting firm for 2023; and

7 – 9.    Consider stockholder proposals, if properly presented at the meeting.

67.    The 2023 Proxy was false and misleading and omitted material information for the following reasons.

***Omission of Material Risks Related to the 360 Savings and 360 Performance Savings Accounts***

68.    As alleged in detail herein, Capital One's deceptive practices regarding the 360 Savings and 360 Performance Savings accounts exposed the Company to significant litigation and regulatory risks, resulting in a $425 million settlement in the Consumer Class Action and investigations by both the CFPB and Attorney General of the State of New York ("**NYAG**"). The 2023 Proxy, however, failed to discuss material risks, as did the Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the "**2022 10-K**"), which was referenced by the 2023 Proxy. Specifically, neither the "Risk Factors" section of the 2022 10-K nor the section regarding "Management's Discussion and Analysis of Financial Condition and Results of Operations ('MD&A')," disclose the risks associated with the Company's deceptive practices. The failure to disclose these risks, such as customer complaints, potential litigation, and regulatory scrutiny, constitutes a material omission.

---

[6] *See* Capital One Financial Corporation, Proxy Statement (Schedule 14A) (Mar. 22, 2023), at 1.

*Misrepresentations Regarding Corporate Governance and Compliance*

69.    The 2023 Proxy includes information on corporate governance and risk oversight (*e.g.*, a section entitled "Corporate Governance at Capital One" starting on page 24 of the 2023 Proxy). As detailed herein and per the Section 220 Production, the Board was aware of the deposit product strategy but failed to address the risks of concealing the 360 Performance Savings account from legacy customers. Statements in the 2023 Proxy asserting robust risk oversight or compliance with legal and regulatory requirements are thus misleading because they omitted to address these specific risks.

*Misrepresentations Regarding the Code of Conduct*

70.    As alleged herein, the Individual Defendants breached Capital One's Code of Conduct, which emphasizes "Do the Right Thing," integrity, and clear communication with customers. Specifically, the Company's deceptive practices, such as prohibiting employees from informing 360 Savings accountholders about the higher-yield 360 Performance Savings account, violated these stated principles. Accordingly, the 2023 Proxy's statements about the Board's commitment to ethical business practices and compliance with the Code of Conduct are misleading because they suggest that the Board ensured compliance with ethical standards, though the Board failed to address or disclose the deceptive practices.

*Director Election and Compensation Considerations*

71.    The 2023 Proxy solicited shareholder votes on the election of twelve directors and a non-binding advisory vote on executive compensation ("Say on Pay").  As alleged herein, the deceptive practices surrounding the 360 Savings and 360 Performance Savings accounts rendered the 2023 Proxy misleading, particularly in its representations about director qualifications, oversight effectiveness, and executive compensation. These misrepresentations and omissions

22

made the votes on director elections and executive compensation improper, as they misled shareholders about critical governance failures and the legitimacy of financial metrics tied to compensation.

72.    The 2023 Proxy proposed the election of twelve directors: Richard D. Fairbank, Ime Archibong, Christine Detrick, Ann Fritz Hackett, Peter Thomas Killalea, Cornelis Petrus Adrianus Joseph Leenaars, François Locoh-Donou, Peter E. Raskind, Eileen Serra, Mayo A. Shattuck III, and Craig Anthony Williams. The 2023 Proxy describes the qualifications and skills of the director nominees, referencing sections such as "Skills and Experience of Our Director Nominees" and "Corporate Governance at Capital One."  The director nominees, however, particularly those on the Audit Committee (Detrick, Leenaars, Serra, and Williams) and Risk Committee (Detrick, Hackett, Killalea, Leenaars, Raskind, and Serra), failed to oversee deceptive practices related to the 360 Savings and 360 Performance Savings accounts. Specifically:

- Capital One concealed the higher-yield 360 Performance Savings account from legacy 360 Savings accountholders, prohibited employees from informing 360 Savings accountholders about the 360 Performance Savings product, and maintained a significant interest rate disparity between the accounts (*e.g.*, 4.25% vs. 0.30% APY by August 2024).

- The Board was aware of the deposit product strategy but focused on deposit growth and profitability rather than addressing risks like customer attrition, negative sentiment, or litigation. Moreover, meaningful discussions about the 360 Performance Savings risks did not occur until January 2024, after public exposure in *The Wall Street Journal*.

- The practices detailed herein violated Capital One's Code of Conduct, which requires clear and truthful communication with customers and compliance with laws, and

23

exposed the Company to a $425 million settlement in the Consumer Class Action and regulatory actions by the CFPB and NYAG.

73.    The 2023 Proxy's descriptions of the directors' qualifications and oversight effectiveness were misleading because they omitted the directors' failure to address the deceptive practices, which breached their fiduciary duties of oversight, candor, and loyalty. Shareholders were not informed that the directors' oversight failures led to significant financial and reputational harm, including a $425 million settlement and regulatory scrutiny. The misleading representations led shareholders to vote for the re-election of these directors, believing they were qualified and effective in their oversight roles. Had shareholders known about the directors' failure to address the deceptive practices, which violated the Company's Code of Conduct and exposed it to substantial liability, they would have voted against their re-election, particularly for those on the Audit and Risk Committees.

74.    Moreover, the 2023 Proxy's failure to disclose that executive compensation was tied to financial metrics inflated by deceptive practices was a material omission. Shareholders were not informed that the performance metrics used to justify bonuses, stock options, or other incentives were partly driven by practices that violated the Company's Code of Conduct and led to a $425 million settlement and regulatory actions. This omission misrepresented the legitimacy of the compensation structure, suggesting that executive pay was based on ethical and sustainable performance.

## SUBSTANTIVE ALLEGATIONS

75.    Capital One is a financial institution that offers banking, credit cards, auto loans, and other financial services. The Company is organized into three major business segments: (i) Credit Card; (ii) Consumer Banking; and (iii) Commercial Banking.

76.     The Company's Consumer Banking offerings include, among other things, high-yield savings accounts. According to Capital One, "a high-yield savings account—sometimes called a high-interest savings account—is a bank account that often has a higher interest rate or annual percentage yield (APY) than a traditional savings account."[7] The Company further states that "[h]igh-yield accounts also pay more interest on money you put in the bank than traditional savings accounts."[8]

77.     Capital One also advises that "the interest rate a bank offers on a high-yield savings rate can change[,]" warning potential customers:

> [T]he interest  rate a bank offers on a high-yield savings account can change. Each bank sets its own interest rates. The Federal Reserve's benchmark interest rate can also change, and that sometimes impacts the interest rate banks offer on a high-yield savings account. That's because the Fed's rates are one of the things that banks use to determine the rates they offer.
>
> In addition, interest rates banks offer sometimes change as the result of bank promotions. Sometimes a bank will offer a high rate for a limited period of time. But the rate decreases once the promotion is over. So, it's important to compare both the promo rate and the standard rate when you look at the options offered by different banks.[9]

78.     On February 17, 2012, Capital One announced that it  acquired ING and its assets. At the time, ING was offering to the public a high-interest online savings account known as "ING Direct."

79.     In early 2013, once the ING acquisition was completed, Capital One rebranded ING Direct as "360 Savings" and converted all ING Direct accountholders into 360 Savings accountholders. The Company assured former ING Direct accountholders that they would "still

---

[7] *What is a high-yield savings account?*, CAPITAL ONE (July 3, 2024), https://www.capitalone.com/bank/money-management/banking-basics/what-is-a-high-yield-savings-account/.

[8] *Id.*

[9] *Id.*

have…great rates" with 360 Savings and promised that Capital One would "continue to be home to no-fee, no-minimum checking and savings accounts – with the great rates that we know are important to you."

***Capital One Promises High Interest Rates that Vary Based on Market Conditions***

80.    Between 2013 and 2019, the Company touted 360 Savings as a "high interest"[10] online savings account with "great rates." Indeed, Capital One advertised 360 Savings as having "one of the nation's highest savings rates."

81.    From May 2013 to at least March 2016, Capital One's website also promised that "360 Savings has no fees, no minimums and no catches. Your money will earn much more than what it would in an average savings or money market account…. What's the catch? There is none."

82.    Capital One repeatedly represented that it would adjust the 360 Savings rate in accordance with market conditions and competition. In January 2018, for example, as the federal funds effective rate gradually increased, Capital One increased the rate on the 360 Savings account from 0.75% to 1.00% and assured customers: "There's nothing for you to do. Just sit back and enjoy the extra interest." The Company would never again raise interest rates on 360 Savings accounts.

***Capital One Introduces a New Online Savings Account***

83.    In September 2019, Capital One stopped offering 360 Savings accounts to new customers, while still servicing existing ones (legacy customers), and launched a new "high-yield" savings product called "360 Performance Savings".

---

[10] A "high interest" savings account offers higher interest rates than "traditional" savings account. Finance websites explain that "high interest" or "high yield" savings account rates "can be as much as 15 times higher than the FDIC national average savings account rate, and 10 to 12 times higher than 'traditional' savings account rates."

84.    The new 360 Performance Savings product was identical to 360 Savings except for one key feature: 360 Performance Savings accounts paid a significantly higher interest rate than 360 Savings accounts.

85.    When the 360 Performance Savings product was introduced, for example, it offered a 1.90% APY, while the 360 Savings account provided for only a 1.00% APY.

86.    Since launching 360 Performance Savings and increasing its interest rates, Capital One has not adjusted rates upward for 360 Savings accounts.

87.    According to one Company spokesperson, since the Federal Reserve increased interest rates in July 2023, the Company "only raised rates on the 360 Performance Savings accounts. Those accounts today pay a rate of 3.8%. The older [360 Savings] accounts pay 0.5%[.]"[11]

88.    Since the launch of 360 Performance Savings, Capital One has consistently kept the interest rate for that product higher than the interest rate for 360 savings, and the gap between those products' rates has grown significantly over time.

89.    From October 2019 through December 2020, Capital One dropped the interest rate paid on 360 Savings accounts from 1.00% APY to 0.30% APY and then froze the APY at 0.30% from December 2020 to the present. By August 2024, the 360 Performance Savings' rate was 4.25%, while the 360 Savings rate was only 0.30%.   Accordingly, 360 Performance paid approximately 93% more than 360 Savings.

90.    Capital One launched the 360 Performance Savings account, which had a nearly identical name to the existing 360 Savings account, without informing 360 Savings

---

[11] Angel Au-Yeung, *Capital One is Sued by Regulator Over the Bank's Savings Accounts*, THE WALL ST. J., (Jan. 14, 2025, 9:46 am ET), https://www.wsj.com/finance/investing/capital-one-sued-by-cfpb-over-itssavings-accounts-5a998630.

accountholders.  Additionally, the Company actively concealed the new product and its significantly higher interest rates from existing/legacy 360 Savings customers.

91.     The Company played fast and loose with its customers through deceptive website promotions.  For example,

92.     On September 17, 2019, Capital One's website listed the 360 Savings account on a page comparing the Company's savings account offerings:[12]



93.     The next day, however, the 360 Savings product was no longer advertised on the Company's website.  Instead, Capital One provided a link to open a 360 Performance Savings account:[13]

---

[12] ttps://www.capitalone.com/bank/open-an-account/ (accessed on June 12, 2025 via Wayback Machine at URL https://web.archive.org/web/20190917195820/https://www.capitalone.com/bank/open-an-account/).

[13] https://www.capitalone.com/bank/open-an-account/ (accessed on June 12, 2025 via Wayback Machine at URL https://web.archive.org/web/20190918192359/https://www.capitalone.com/bank/open-an-account/).

# Compare savings accounts.





94.    To this day, customers cannot find information about 360 Savings accounts on the Capital One website. When navigating to "[c]ompare all savings accounts[,]" only the 360 Performance Savings account is listed as a product option.

95.    Indeed, all references to 360 Savings on the Capital One website were buried, supporting the assumption that 360 Performance Savings was merely a new name for the existing product, not an entirely different account with a dramatically higher interest rate. The Company even updated its website so that the URL for the 360 Savings page automatically sent users to the 360 Performance Savings page instead.

96.    Moreover, according to the CFPB Action, Capital One prohibited its employees from telling 360 Savings accountholders about the new 360 Performance Savings Product. For example, Capital One told associates who work in the Company's physical branches that they "must not proactively mention the ability to convert [360 Savings accounts to 360 Performance

Savings accounts] to customers." Similarly, branch employees were forbidden from forwarding 360 Savings accountholders to Bank Voice—the Capital One unit that handles account conversions—unless the accountholders "ask[ed] directly about the ability to convert accounts."

97.    According to the complaint filed in the NYAG Action, Capital One  instructed employees to "only be reactive in mentioning 360 Performance Savings to… [legacy] 360 Savings account holders."

| | |
|---|---|
| **Account Opening** | Customers can open the new account online or at a Capital One location.<br>• All interested customers who meet eligibility requirements are welcome to open a 360 Performance Savings Account. |
| | • You must only be **reactive** in mentioning 360 Performance Savings to 360 Money Market or 360 Savings account holders<br>• **EXAMPLE:** If the customer asks you, "Do you have any higher rate accounts?" you're able to explain the benefits of a 360 Performance Savings and help them open an account. ⓘ |
| **Closing an Existing Account** | Customers interested in the highest rates available may decide to close their other savings products in favor of a 360 Performance Savings.<br>• **CSST**<br>  ○ You must only be **reactive** in offering to move balances from an existing account with us; but, if they're already opening a 360 Performance Savings account and moving over all of their balances, it's fine to offer to help close the old account with $0 deposit balances.<br>    ■ **EXAMPLE**: If the customer asks you, "Do you have any higher rate accounts?" you're able to explain the benefits of a 360 Performance Savings. |

98.    Further, the Company told employees that they could "[o]nly offer the option to convert [a 360 Savings] account" to a 360 Performance Savings account in four scenarios, each of which involved a 360 Savings accountholder who was already aware that 360 Performance Savings and 360 Savings were distinct products and/or was expressly unhappy about his or her 360 Savings interest rate.

99.    Although this obfuscation saved the Company money—more than $2 billion in unpaid interest, according to the CFPB Action—it  exposed Capital One to substantial risk of liability if the fraud were to be discovered.

30

***The Board Places Short-Term Profits Over Long-Term Risk Management***

100.    

101.

102.



103. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

104. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████—after an article in *The Wall Street Jornal* noted the dramatic discrepancy in the interest rates paid on the Company's savings account offerings.

105. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

106. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

107. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████

108. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███

109. ██████████████████████████████████
████████████████████████████████████████████
████



110.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

111.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[14] Capital One, *Nicole Lapin's Top 5 Tips to Save*, https://www.capitalone.com/about/newsroom/national-savings-day-2022/ (last visited June 19, 2025).

████████████████████████████████████████████

██████████████████████

***Capital One Faces Consumer Backlash***

112.    Between July 10, 2023, and March 1, 2024, seven class action lawsuits were filed against the Company by current or former 360 Savings accountholders. These suits alleged, *inter alia*, that: (i) Capital One deceptively marketed the 360 Savings account; (ii) Capital One failed to disclose that 360 Savings was no longer Capital One's high-yield online savings account; (iii) Capital One failed to disclose the existence and higher interest rate of the 360 Performance Savings product to 360 Savings accountholders; (iv) Capital One violated state consumer protection laws; and (v) Capital One breached the contracts it had with 360 Savings accountholders, as well as the implied covenant of good faith and fair dealing incorporated therein. On June 7, 2024, the U.S. Judicial Panel on Multidistrict Litigation ("**JPML**") transferred the seven pending lawsuits to the United States District Court for the Eastern District of Virginia for coordinated pretrial proceedings under the caption *In re: Capital One 360 Savings Account Interest Rate Litigation*, No. 1:24-md-03111-DJN.

113.    ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████



114.    Meanwhile, on January 21, 2024, *The Wall Street Journal* published an article titled: "They Thought Their Money Was in High-Interest Accounts—They Got Paid Peanuts[.]" The article noted that, "[w]hen the Federal Reserve started raising interest rates in 2022, many customers of the McLean, Va., bank assumed their rates would go up. Instead, Capital One is paying them far below the 4.35% it advertises on its main savings account."[15]

115.    Describing the discrepancy between the rates paid on the two savings accounts, *The Wall Street Journal* indicated that "[c]ustomers around the country who have the older [360 Savings] accounts are complaining about the discrepancy to the Consumer Financial Protection

---

[15] Rachel Louise Ensign, *They Thought Their Money Was in High-Interest Accounts—They Got Paid Peanuts*, The Wall St. J. (Jan. 21, 2024), available at https://www.wsj.com/finance/investing/capital-one-high-interest-savings-complaints-b9adc1e9?gaa_at=eafs&gaa_n=ASWzDAj8IvD_MloG_VGsc5cl8PXODilL22-Sw90xS_hP55yKq3XWLs7yLlCS&gaa_ts=685ebf34&gaa_sig=elFmY33ejSAM-Gq2hawiJWeE8p8kypljRIYOkcKyrA2JMJaGSCZSerpz9rB3dC0h1JGoRCQj4jDGebwryenS8Q%3D%3D.

Bureau."[16] The article quoted a portion of a customer complaint to the CFPB in October 2023, which stated:

> I opened a high yielding savings account with a variable interest rate with ING Direct in XXXX. At some point, CapitalOne purchased ING Direct and I became a CapitalOne customer with a CapitalOne 360 Savings Account. At the time, interest rates were high and I received a high savings interest rate. As interest rates fell, the interest rate on my account understandably fell as well, eventually falling below 1 %. With the rise of interest rates in the last couple of years, I expected my interest rate to rise but instead my savings account interest rate has been frozen at .3 % since [2019]. I just learned that around that time CapitalOne created a new product called CapitalOne [360 Performance Savings] and began enticing XXXX customers with high interest rates while doing nothing to raise the interest rates for existing customers nor did they specifically notify existing customers about the existence of this new product - no email and no in-App notification. I am outraged that for the last 2 years, [Capital One] has paid me a pittance in interest….while it has been paying new customers over 4%. They essentially abandoned existing customers in pursuit of new customers and never bothered to tell us.[17]

116.    Another customer told *The Wall Street Journal* that he opened savings accounts at ING because of "the opportunity to earn more than he could at a traditional bank[.]"[18] He noted that "he keeps close track of his finances" but "felt comfortable leaving a six-figure sum in Capital One savings accounts because it seemed to be paying well when he checked the bank's website monthly. The only savings rate he saw was for 360 Performance Savings."[19] After reading about

---

[16] *Id.*

[17] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/7664165.

[18] Rachel Louise Ensign, *They Thought Their Money Was in High-Interest Accounts—They Got Paid Peanuts*, The Wall St. J. (Jan. 21, 2024), available at https://www.wsj.com/finance/investing/capital-one-high-interest-savings-complaints-b9adc1e9?gaa_at=eafs&gaa_n=ASWzDAj8IvD_MloG_VGsc5cl8PXODilL22-Sw90xS_hP55yKq3XWLs7yLlCS&gaa_ts=685ebf34&gaa_sig=elFmY33ejSAM-Gq2hawiJWeE8p8kypljRIYOkcKyrA2JMJaGSCZSerpz9rB3dC0h1JGoRCQj4jDGebwryenS8Q%3D%3D.

[19] *Id.*

the Consumer Class Action, this customer realized he had missed out on thousands of dollars of interest, and moved all of his money to another bank.[20]

117.    In a statement to *The Wall Street Journal*, Celia Edwards Karam, president of the Company's retail bank, stated: "[o]ver the years, we set out to greatly simplify our savings offerings, most of which were inherited via multiple acquisitions," adding that "Capital One's Performance Savings accounts are marketed widely [21]and aren't restricted to new customers[.]"

118.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

119.    On August 1, 2024, the Company received a Civil Investigative Demand from the CFPB relating to the 360 Savings and 360 Performance Savings product offerings. In October 2024, the CFPB issued a Notice of Opportunity to Respond and Advise ("**NORA**") letter regarding the savings account issues. Although the Company disclosed the receipt of the Civil Investigative Demand and the NORA letter in its Form 10-Q filed with the SEC on October 31, 2024, indicating that the CFPB was "considering an enforcement action" against the Company, ██████████

████████████████████████████████████████████████████

████████████████████████████

---

[20] *See id.*

[21] *Id.*

120.    Ultimately, on January 14, 2025, the CFPB filed a lawsuit against Capital One, alleging that the Company had violated the Consumer Financial Protection Act of 2010 ("**CFPA**"), the Truth in Savings Act ("**TISA**"), and TISA's implementing regulation, Regulation DD. The CFPB sought injunctive relief, civil monetary penalties, costs, and monetary relief necessary to redress injuries to Capital One consumers.[22]

121.    On February 2, 2025, *The New York Times* published an article about banks "profit[ing] from customers' confusion."[23] The article referenced the CFPB Action, noting that the CFPB alleged that Capital One had gone "too far by intentionally creating confusion so that customers wouldn't know how to switch to a higher-paying account at the same bank."[24]

122.    *The New York Times* used the following graphic to demonstrate the difference in the interest that customers would have earned in interest if they had switched from a 360 Savings account to a 360 Performance Savings account:

---

[22] On February 4, 2025, the CFPB filed an emergency motion to temporarily stay certain deadlines in the CFPB Action, as the Acting Director of the CFPB designated by President Trump on January 31, 2025, had "directed counsel for the [CFPB] not to make filings or appearances in any litigation, other than to seek a pause in proceedings." CFPB Action, Dkt. 13. The Court granted an extension of deadlines, but denied the request for a stay, and the CFPB Action was ultimately voluntarily dismissed on February 27, 2025. *See* CFPB Action, Dkt. 21.

[23] Ben Blatt, *Why Banks May Be Hoping You're Not Paying Attention*, THE NEW YORK TIMES (Feb. 2, 2025), available at https://www.nytimes.com/2025/02/02/upshot/capital-one-savings-interest.html.

[24] *Id.*



**Balance of $10,000 Put in a Savings Account in January 2019**

Source: Historical savings account A.P.Y. data gathered from archived versions of bank and bank review websites. Values are approximate and were calculated based on one marketed A.P.Y. data point for each month.

123.    The CFPB "estimated that Capital One avoided paying $2 billion by not automatically converting each 360 Savings account to a 360 Performance Savings account."[25] Though Capital One said it "disagree[d] with the characterizations made in the [CFPB]'s suit[,]"[26] the difference in the interest rates associated with the two savings account products in January 2025 was tremendous:

---

[25] *Id.*

[26] *Id.*

## Interest Rates of Savings Accounts in January 2025

|  | A.P.Y. |
|---|---|
| Bank of America Advantage Savings | 0.01% |
| Chase Savings | 0.01% |
| Wells Fargo Way2Save Savings | 0.01% |
| PNC Standard Savings | 0.01% |
| Citi Savings | 0.03% |
| U.S. Bank Smartly Savings | 0.05% |
| Capital One 360 Savings | 0.5% |
| Discover Online Savings | 3.75% |
| Capital One 360 Performance Savings | 3.8% |
| Ally Savings | 3.8% |

Source: Bank websites and promotional materials. Data collected January 2025. Standard rate advertised to customer with $10,000 in savings. Some banks offer higher rates if you have other products within their banking ecosystem.

124.    As *The New York Times* pointed out, however, "[b]anks know their customers are generally not attentive to account details."[27] Indeed, "[a] study commissioned by Capital One found that many people check their savings account less than once a month, and about half don't know what interest they are earning."[28]

125.    While some thought the CFPB had overstepped in suing Capital One, a law professor interviewed by *The New York Times* noted that the Dodd-Frank Act of 2010 established that "a financial service provider could be held liable for taking unreasonable advantage of consumers' inability to understand the products that they are being offered."[29] As *The New York*

---

[27] *Id*.

[28] *Id*.

[29] *Id*.

*Times* pointed out, Capital One did not email existing customers about the availability of 360 Performance Savings accounts until the CFPB began its investigation in August 2024 – nearly five years after the product was initially introduced.[30]

126.    Whether or not the CFPB Action ultimately would have been successful, the Company wasted valuable resources in connection with the bureau's investigation.

127.    The Consumer Class Action ultimately cost the Company hundreds of millions of dollars. On May 16, 2025, after nearly two years of litigation, the parties to the Consumer Class Action filed a Joint Notice of Class Action Settlement Terms, which indicated that the Company had agreed to settle the case for $425 million.[31]

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

128.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

129.    Plaintiff brings this action derivatively, in the right and for the benefit of the Company, to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

130.    Capital One is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

---

[30] *See id.*

[31] *See* Consumer Class Action, Dkt. 160.

132.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Capital One. Plaintiff will adequately and fairly represent the interests of Capital One in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action

133.    A pre-suit demand on the Board of Capital One is futile and, therefore, excused. At the time of filing this action, the Board consists of 15 directors: Individual Defendants (i) Fairbank; (ii) Archibong; (iii) Detrick; (iv) Hackett; (v) Killalea; (vi) Leenaars; (vii) Locoh-Donou; (viii) Raskind; (ix) Serra; (x) Shattuck; and (xi) Williams (collectively, the "**Demand Defendants**"), as well as non-parties (xii) Harford; (xiii) Maheras; (xiv) Shepherd; and (xv) Wong. Plaintiff needs only to allege demand futility as to a majority of the directors (*i.e.*, eight directors) who are on the Board at the time this action is commenced.

134.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

135.    Each of the Demand Defendants faces a substantial likelihood of liability for breaching their fiduciary duties by knowingly permitting Capital One to continue a deceptive and inequitable product structure, whereby new customers received materially better interest rates under the Performance Savings 360 account while legacy customers remained in older, lower-rate accounts without notice or opportunity to convert.

136.    Moreover, Defendants Detrick, Leenaars, Serra, and Williams (the "**Audit Committee Defendants**"), as members of the Audit Committee, failed to address the misconduct described herein. The Audit Committee Charter indicates that the Audit Committee is responsible

for risk assessment and risk management, as well as the Company's compliance with legal and regulatory requirements. Nevertheless, the Audit Committee Defendants allowed the misconduct alleged herein to continue unchecked for several years, thereby breaching their fiduciary duties to the Company. Thus, the Audit Committee Defendants face a substantial risk of liability for breach of fiduciary duty and any demand as to them is excused as futile.

137.    Similarly, Defendants Detrick, Hackett, Killalea, Leenaars, Raskind, and Serra (the "**Risk Committee Defendants**"), as members of the Risk Committee, failed to address the misconduct herein. The Risk Committee Charters specifies that the Risk Committee Defendants are responsible for, *inter alia*, overseeing the Company's risk management processes, as well as assessing the adequacy and effectiveness of the Company's risk assessment processes, and reviewing any deficiencies in those processes. ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Accordingly, the Risk Committee Defendants face a substantial risk of liability for breach of fiduciary duty and any demand as to them is excused as futile.

138.    Demand is further excused as to Defendant Fairbank, the founder, CEO, and Chairman of Capital One. His role with Capital One is Defendant Fairbank's principal professional occupation, and he has earned substantial compensation from the Company. Specifically, for the years 2019 through 2024, Defendant Fairbank received over $130 million in compensation from Capital One. His substantial compensation,  coupled with his long-standing control over the Company, indicates that Defendant Fairbank lacks independence from the other Demand Defendants, due to his interest in maintaining his executive role at the Company. This lack of

independence renders Defendant Fairbank incapable of impartially considering a demand to prosecute this action.

## COUNT I

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

139.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

140.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

141.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

142.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

143.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2023 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

144.    The false and misleading elements of the 2023 Proxy led to the re-elections of the Individual Defendants, allowing them to breach their fiduciary duties to Capital One.

145.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy.

146.    Plaintiff, on behalf of Capital One, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants
*for Breach of Fiduciary Duties*

147.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

148.    Each Individual Defendant, as an officer and/or director of Capital One, owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Capital One's business and affairs.

149.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

150.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Capital One.

151.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

152.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

153.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes, even though conflicting facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

48

154. The Audit Committee Defendants breached their duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, and which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

155. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Capital One has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, the Individual Defendants are liable to Capital One.

156. Plaintiff, on behalf of Capital One, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
*for Unjust Enrichment*

157. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

158. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Capital One.

159. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Capital One tied to the performance or artificially inflated valuation of Capital One, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct during the Relevant Period.

160.    Plaintiff, as a stockholder and a representative of Capital One, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

161.    Plaintiff, on behalf of Capital One, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Capital One and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Capital One;

C.    Awarding to Capital One the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Capital One and the Individual Defendants to take all necessary actions to reform and improve Capital One's corporate governance and internal procedures to comply with applicable laws and to protect Capital One and its shareholders from a repeat of the damaging events described herein;

E.    Awarding Capital One restitution from the Individual Defendants, and each of them;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial in this matter on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: July 18, 2025

Respectfully submitted,

By: /s/ *Elizabeth K. Tripodi*
Elizabeth K. Tripodi (VA Bar #73483)
**LEVI & KORSINSKY, LLP**
1101 Vermont Ave. NW,
Suite 800 Washington, D.C. 20005
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: etripodi@zlk.com

Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel.: (212) 363-7500
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Sendy Paola Mongiello, in my capacity as Trustee of the Kathryn Caliguiri Irrevocable Trust (the "Trust"), do hereby verify that the Trust is a holder of common stock of Capital One Financial Corporation and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint on behalf of the Trust. All of the averments in the Complaint regarding the Trust are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   July 11, 2025

_____
Signed by:
*Sendy Paola Mongiello*
7625FAA62C3344F...
Sendy Paola Mongiello, Trustee
Kathryn Caliguiri Irrevocable Trust